SUPERIOR COURT 
 
 BRAMMER BIO LLC v. BOSTON PROPERTIES LIMITED PARTNERSHIP; 290 BINNEY LLC; THE TRUSTEES OF FOURTEEN CAMBRIDGE CENTER TRUST; AND TURNER CONSTRUCTION COMPANY

 
 Docket:
 2484CV01121-BLS2
 
 
 Dates:
 May 16, 2024
 
 
 Present:
 Kenneth W. Salinger
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 FINDINGS, DECISION, AND ORDER DENYING PLAINTIFF’S MOTION FOR PRELIMINARY INJUNCTION
 
 

 Brammer Bio LLC claims the Defendants are engaged in construction activities that trespass on premises it is subleasing in East Cambridge. Brammer asks the Court to issue a preliminary injunction that would bar Defendants from continuing to construct a new high-rise building known as 290 Binney Street on any part of premises that Brammer has subleased at 250 Binney Street.[1]
The Court will deny Brammer’s motion for a preliminary injunction because Brammer has not shown that it is likely to succeed on its trespass claim.[2] Based on the evidence presented, the Court finds and concludes that Brammer has no right of exclusive occupancy within the vehicular access area known as East Service Drive, Brammer’s rights under its sublease are subordinate to a revised easement that allows the disputed construction in a small section of what had been a roadway, and neither the ongoing construction activities nor the final building will impair Brammer’s right to access its loading dock area.
1. Preliminary Injunction Standard. “Trial judges have broad discretion to grant or deny injunctive relief.” Lightlab Imaging, Inc. v. Axsun Technologies, Inc., 469 Mass. 181, 194 (2014). “A preliminary injunction is an extraordinary remedy never awarded as of right.” Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To the contrary, “the significant remedy of a preliminary injunction should not be granted unless the plaintiffs had made a clear showing of entitlement thereto.” Student No. 9 v. Board of Educ., 440 Mass. 752, 762 (2004).
 
--------------------------------------------
 
[1] Though Brammer’s motion did not seek relief against the Fourteen Cambridge Center Trust, its proposed order would apply against all four defendants.
[2] Brammer has also asserted claims for nuisance and for breach of its contractual right to quiet enjoyment of the subleased premises. But Brammer expressly bases its preliminary injunction motion only on the trespass claim.
 
                                                            -1-
 
Normally, “[a] party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that irreparable harm will result from denial of the injunction; and (3) that, in light of the moving party’s likelihood of success on the merits, the risk of irreparable harm to the moving party outweighs the potential harm to the nonmoving party in granting the injunction.” Boston Firefighters Union, Local 718, Int’l Ass’n of Fire Fighters, AFL- CIO v. City of Boston, 491 Mass. 556, 562 (2023) (cleaned up), quoting Garcia v. Department of Housing & Community Dev., 480 Mass. 736, 747 (2018). “The public interest may also be considered in a case between private parties where the applicable substantive law involves issues that concern public interest[s].” Bank of New England, N.A. v. Mortgage Corp. of New England, 30 Mass. App. Ct. 238, 246 (1991).
Since real property is unique, however, it appears that Brammer does not need to show irreparable harm in order to obtain a preliminary injunction barring a continuing trespass. See Massachusetts Port Auth. v. Turo Inc., 487 Mass. 235, 247 & n.5 (2021); accord Ferrone v. Rossi, 311 Mass. 591, 593 (1942).
The Court recognizes that this rule “does not apply in those exceptional cases where the substantial rights of the landowner may be properly safeguarded without recourse to an injunction which in such cases would operate oppressively and inequitably.” Ferrone, 311 Mass. at 593; see also Peters v. Archambault, 361 Mass. 91, 93 (1972). Since the Court concludes that Brammer is not likely to succeed in proving its trespass claim, it need not decide whether this is one of the rare cases in which irreparable harm must be shown before a continuing trespass may be preliminarily enjoined.
A party is not entitled to preliminary injunctive relief if it cannot prove that it is likely to succeed on the merits of its claim. See, e.g., Fordyce v. Town of Hanover, 457 Mass. 248, 265 (2010) (vacating preliminary injunction); Wilson v. Commissioner of Transitional Assistance, 441 Mass. 846, 858–859 (2004) (same). If the party seeking a preliminary injunction cannot demonstrate any likelihood of success on the merits, “the remaining factors become matters of idle curiosity.” Lieber v. President and Fellows of Harvard College, 488 Mass. 816, 822 (2022), quoting Foster v. Commissioner of Correction, 484 Mass. 698, 712 (2020).
2. Findings of Fact. The Court makes the following findings of fact based on the affidavits and exhibits submitted by the parties, and on reasonable
 
                                                            -2-
 
inferences that the Court has drawn from that evidence.[3] It does not credit opinions or statements in affidavits that are inconsistent with these findings.[4]
2.1. The Property and the Parties. The property at 250 Binney Street in Cambridge, Massachusetts, is owned by the Fourteen Cambridge Center Trust. The sole beneficiary of this Trust is Boston Properties Limited Partnership, which refers to itself as “BPLP.”
The 250 Binney property is adjacent to 290 Binney Street, which is now owned by 290 Binney LLC. The 250 Binney and 290 Binney properties are located within a 9.7 acre area designated as the Parcel 2 Development Area by the Cambridge Redevelopment Authority, as part of its Kendall Square Urban Redevelopment Plan. The 250 Binney property is also referred to as Tract I or as 14 Cambridge Center in various legal documents. It is located immediately to the southeast of 290 Binney. A vehicular access roadway known as East Service Drive is (or was) located on the northwestern edge of the 250 Binney property, along the 290 Binney property line.
BPLP and its affiliates have retained Turner Construction Company to serve as general contractor for a $1.7 billion redevelopment project of parts of Parcel 2. As discussed in more detail below, this project includes constructing a new building and below-grade parking garage at 290 Binney Street.
2.2. Biogen’s Lease. The Trust leased 250 Binney Street to a predecessor of Biogen MA Inc. in October 1982. Section 7.2 of this Lease notes that the Trust or its affiliates may from time to time develop and construct other buildings within Parcel 2, and may also “construct internal roadways, sidewalks and pedestrian walks” to serve the 250 Binney premises “and all other parcels of land” within Parcel 2.
--------------------------------------------
 
[3] Brammer also cites to various allegations in its Complaint. But the complaint is not verified. Allegations in an unverified complaint are not evidence of anything. See generally McInnes v. LPL Financial, LLC, 466 Mass. 256, 265 (2013); Breakiron v. Gudonis, 452 Mass. 1008 (2008) (rescript); Windsor v. Windsor, 45 Mass. App. Ct. 650, 654–655 (1998).
[4] When considering sworn affidavits, “the weight and credibility to be accorded those affidavits are within the judge’s discretion” and “[t]he judge need not believe such affidavits even if they are undisputed.” Commonwealth v. Furr, 454 Mass. 101, 106 (2009). An affidavit “is a form of sworn testimony the credibility of which is to be determined by the judge.” Psy-Ed Corp. v. Klein, 62 Mass. App. Ct. 110, 114 (2004).
 
                                                            -3-
 
In addition, § 7.2 also provides that the Trust may “use portions of the Site” to “construct and relocate” any “internal roadways, sidewalks and pedestrian paths.” The only limitation imposed on the Trust’s ability to construct or to relocate roadways, sidewalks, and pedestrian paths on the 250 Binney property was that such use could “not unreasonably affect” Biogen’s use of the site.
Since the Lease reserved to the Trust the right to construct and relocate internal roadways on the leased premises, it implicitly allows the Trust and its designees to enter onto those premises and to install temporary barriers and fencing for that purpose.[5]
Finally, § 7.2 also provided that Biogen was granted a right to use “internal roadways, sidewalks and pedestrian paths” on the leased site, or elsewhere within Parcel 2, “in common with” the Trust, other tenants or occupants within Parcel 2, and anyone having business with them. This made clear that Biogen did not have an exclusive right to occupy or use internal roadways on the   250 Binney site.
2.3. Parcel 2 Easement Agreement. Biogen agreed in March 1990 that its rights under the Lease would be subordinate to a new “Parcel 2 Easement Agreement.” This Easement Agreement was a contract among the CRA, the Trust, and the trustees of two other trusts that also owned property within Parcel 2. It took effect on March 19, 1990.
In § II.8(c) of the Easement Agreement, the Trust gave the current and future fee owners of property within Parcel 2 a “co-exclusive right and easement” to use a specified part of the 250 Binney site “for the purpose of providing vehicular access” from Binney Street to individual sites within Parcel 2, and to provide “vehicular egress” from those sites to Broadway. The contract referred to this right as a “vehicular easement.”
The internal roadway known as East Service Drive, which provides access to and egress from the two 250 Binney Street loading docks, is within this vehicular easement. As explained above, Biogen had the non-exclusive right under its Lease to share in the vehicular use of East Service Drive.
 
--------------------------------------------
 
[5] “Because a lease is a contract, its property interpretation is a ‘question of law  for the court.’ ” Cambridge Street Realty, LLC v. Stewart, 481 Mass. 121, 130 (2018) (internal citation omitted), quoting Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516 (1970).
                                                            -4-
 
Section 2 of the Easement Agreement provides that “any of the easements and rights created herein may be terminated or altered at any time by the agreement of all of the then fee owners and mortgagees” of the individual sites within Parcel 2.
Biogen agreed that its rights under the Lease were subordinate “to the easements, rights and obligations” that were “created, granted, and imposed” in the Easement Agreement. Biogen did so by executing a document titled “Tenant’s Consent and Subordination,” on March 28, 1990. By signing this document, Biogen also agreed that its Lease would be subordinate to any future “easements or rights … hereafter granted by the Trust pursuant to the terms and conditions of the Easement Agreement,” without the necessity of executing, delivering, or recording any further document.
2.4. Brammer’s Sublease. In November 2016, Biogen subleased the 250 Binney premises to Brammer, including Biogen’s rights under the Lease “to use access ways, drives, entrances, exits[,] and easements used in connection with the Premises.” This language conveys to Brammer the non-exclusive right to share in the use of East Service Drive that Biogen obtained under the Lease.
Under the terms of its Lease, Biogen could not sublease the 250 Binney Street premises without the Trust’s consent. The Trust gave its consent in a three-way contract among the Trust, Biogen, and Brammer called the “Consent to Sublease,” which was executed on the same day as the Sublease.
Brammer agreed in Sublease § 10(a) that its rights under the Sublease “shall be subject and subordinate to the Prime Lease and to all matters to which the Prime Lease is or shall be subject and subordinate.” It similarly agreed in § 3 of the Consent to Sublease that its rights under the Sublease “shall be subject and subordinate at all times to the Lease and all amendments thereof, this Consent[,] and all other instruments to which the Lease is or may hereafter be subject and subordinate.”
In August 2023, Brammer exercised its option to extend the term of the Sublease by an additional five years, through October 2029. [6]
 
--------------------------------------------
 
[6]  In a prior action, the Court held that Brammer was entitled to exercise its option to extend the term of the sublease. More specifically, the Court determined “that: (I) in ¶ 2(c) of the sublease between Biogen and Brammer, the phrase ‘active manufacturing operations as contemplated under the Transaction Agreements’ refers to manufacturing operations that Brammer is actively
 
                                                            -5-
 
2.5. Restated Easement Agreement. The owners of property within Parcel 2 have executed five amendments to the Easement Agreement since 1990. The most recent amendment, titled the “Amended and Restated Parcel 2 Easement Agreement,” was executed and took effect on February 7, 2024. This amendment rewrote and superseded the prior agreement. The Court will refer to this as the “Restated Easement Agreement.”
The Restated Easement Agreement altered the existing vehicular easement for East Service Drive by converting part of it into the “290 Binney Building Easement.” This easement is a long, narrow, rectangular area containing 2,046 square feet along the northwestern edge of the 250 Binney property, adjacent to the 290 Binney Street property. This easement is a little less than 8-feet wide and roughly 260 feet long. It runs the full length of the 250 Binney parcel.
The Trust granted to the owner of 290 Binney Street “the perpetual and exclusive right and easement to construct, reconstruct, support, maintain, repair, and replace any and all portions of the 290 Binney Building located within the 290 Binney Building Easement Area.”
2.6. Biogen’s Assignment of Lease and Sublease. On the same day that the Restated Easement Agreement was executed, Biogen assigned to the Trust— and the Trust agreed to assume—all of Biogen’s “obligations, covenants, right, title, and interest in, to and under” the Lease of the 250 Binney Street premises and under the Sublease to Brammer. The Trust also executed a Confirmatory Consent and Subordination, in which it confirmed that the Lease is subordinate to the Restated Easement Agreement.
2.7. Construction Activity. In March 2022, the Cambridge Planning Board approved plans for the next phase of the redevelopment of Parcel 2 by BPLP and its affiliates.
 
--------------------------------------------
 
undertaking for Biogen or for other customers of Brammer, so long as they are similar to the manufacturing operations that Biogen had contracted to receive from Brammer; and (ii) Biogen’s position that Brammer’s right to extend the sublease is conditioned upon Brammer being engaged in active manufacturing operations for Biogen is incorrect.” See Decision and Order on Biogen’s Summary Judgment Motion and the Other Defendants’ Motion to Dismiss, in Brammer Bio MA LLC v. Biogen MA, Inc., Suffolk Super. Ct. civil action no. 2284CV01962-BLS2,  slip  op.  at  9,  2023 WL 2757215, 2023 Mass. Super. LEXIS 19 (March 29, 2023).
 
                                                            -6-
 
The Board approved the demolition of a parking garage that ran between Binney Street and Broadway on what was known as Tract IV. The Binney Street end of the garage was adjacent to 250 Binney Street. That garage, known as the “Blue Garage,” contained about 1,100 parking spaces.
The Board also approved the construction, on the site then occupied by the Blue Garage, of: (I) a new commercial building at 290 Binney Street—with roughly 400,000 square feet of gross-floor area above ground, and a parking garage containing over 500 spaces below grade—that will serve as the research headquarters for AstraZeneca Pharmaceuticals; (ii) a new 37-story residential building at 121 Broadway with up to 439 units, 25 percent of which will be designated for below market-rate residents; (iii) a new below-ground vault to accommodate an electrical transformer substation for Eversource; and (iv) a new public open space area above the electrical vault.
Boston Properties engaged Turner Construction Company as the general contractor for this project.
In November 2022, Biogen (as lessor of 250 Binney Street) granted a temporary construction access license that authorized BPLP and its affiliates to access the 250 Binney property to conduct certain activities related to this redevelopment project. Among other things, the license authorized BPLP to realign East Service Drive and to install temporary construction, traffic, and pedestrian fencing. This license was consistent with the Trust’s right under the Lease to construct and relocate internal roadways, so long as doing so does not unreasonably affect use of the site by Biogen or its sublessee Brammer.
The demolition of the Blue Garage began in January 2023 and was completed in March 2023. Brammer previously held the right to park almost 170 vehicles in that garage. In December 2022, the Trust and other BPLP affiliates agreed to relocate Brammer’s parking rights to a different, nearby garage, and to let Brammer use those parking rights free of charge until the replacement garage under 290 Binney opens. Brammer agreed to that arrangement.
The new Eversource substation will share part of a below-grade, foundation slurry wall with the 290 Binney building and the parking garage below it. New electrical distribution lines will run from the Eversource substation through the first level of the 290 Binney parking garage to the North, and under the residential building at 121 Broadway to the South.
 
                                                            -7-
 
Construction of the slurry wall that will surround the 290 Binney Street building and garage began in July 2023 and was completed on January 8, 2024. The southeastern portion of this slurry wall runs under the northwestern edge of the prior location of East Service Drive on the 250 Binney site. It lies completely within the new 290 Binney Building Easement.
Boston Properties  is  using  an  “up-down”  construction  method  for  the  290 Binney project, meaning that the structure of the above-grade building will be installed while below-grade levels are excavated. Trucks carrying excavated material from 290 Binney will use Binney Street, not East Service Drive. The 290 Binney building will be mostly completed before construction begins on the below-grade parking garage. Vertical construction of the 290 Binney building began April 6, 2024, and is scheduled to be completed by October 2024. As of May 3, 2024, the steel-beam structure for the ground floor and part of the second floor had already been installed. Down construction of the parking garage is scheduled to begin in July 2024 and to be completed by October 2025. The entire project is scheduled to be completed by May 2026.
When the 290 Binney building is complete, it will extend about five feet over the 250 Binney lot line. That portion of the new building will be entirely within the 290 Binney Building Easement.
2.8. Impacts on Brammer. Since Brammer stopped using the Blue Garage that has now been demolished, it needs to use East Service Drive only for delivery trucks to access its loading docks and Airgas storage tanks. The Airgas tanks are next to the loading docks, concealed by a wall.[7] When the 290 Binney building and garage are completed, Brammer employees will also use East Service Drive to get to and leave the new underground garage.
The Court credits the assertion by one of Brammer’s affiants, Michael Furlong, that “free and unimpeded access to delivery of component materials and pick- up of waste materials” to or from the 250 Binney loading dock area “is absolutely critical to Brammer’s operations.”
But the Court finds that Defendants have done nothing, and are not planning to do anything, that will interfere with ability of trucks to access the loading dock and Airgas storage tank areas to deliver supplies or take away waste materials. It further finds that Brammer’s conclusory assertion that Defendants’
 
--------------------------------------------
 
[7]        They are visible in the first photo in Exhibit 14 to the Affidavit of Jeffrey J. Lowenberg.
 
                                                            -8-
 
past and planned construction activities in the 290 Binney Easement area pose an existential threat to Brammer’s business has no basis in fact.
2.8.1. Impacts to Date. BPLP and its affiliates have made substantial changes to its construction plans, at Brammer’s request, to ensure that the 290 Binney project does not restrict access to Brammer’s loading dock area off of East Service Drive.
o After Brammer complained that planned sewer connection work would close access to East Service Drive during daytime hours for a period of time, Boston Properties developed and obtained City of Cambridge approval for an alternate plan that will not affect vehicular access to East Service Drive.
o When Brammer complained that the planned use of East Service Drive as a zone for a construction crane to pick up and move steel beams was problematic, because it would regularly close that access route and could affect deliveries to 250 Binney Street, Boston Properties adjusted the construction site logistics and moved this steel picking zone to ensure that East Service Drive can remain open 24-hours a day, from Binney Street to the 250 Binney loading docks, throughout the construction of the 290 Binney building and garage.
o After Brammer complained that a plan to locate a tower crane next to East Service Drive could affect truck access to Brammer’s loading docks, Boston Properties sought and obtained City approval to relocate this crane to Binney Street within the public right of way.
o Boston Properties also paid for Turner construction to expand the concrete apron around Brammer’s Airgas storage tanks to improve maneuverability and access in the storage tank area. This will allow Airgas trucks to deliver to Brammer and exit East Service Drive on Broadway, without having to back down East Service Drive to Binney Street, as Brammer had feared.
Turner has had construction barriers and fencing installed along East Service Drive, for the full-length of the 250 Binney property, since January 2023. The barriers and fencing create the necessary buffer zone for the garage demolition, slurry wall construction, and vertical construction of the 290 Binney building. The current width of East Service Drive varies from a maximum width of 19.4 feet at the Binney Street entrance to a minimum width of 12 feet. Near
 
                                                            -9-
 
Brammer’s loading docks, the barriers and fencing have been moved closer to the 290 Binney side of East Service Drive to make it easier for trucks to pull into or leave Brammer’s loading docks.
By comparison, the standard width of a single travel lane on Cambridge public streets is 11 feet. The Court credits Jeffrey Lowenberg’s opinion that the space available for truck traffic on East Service Drive is more than sufficient to meet Brammer’s access needs.
Over the past sixteen months, since the barriers and fencing have been in place along the western side of East Service Drive, these structures have not had any adverse impact on Brammer. The box trucks pulling into Brammer’s loading docks are no more than 8.5 feet wide and 26 feet long. On average, Brammer receives four delivery trucks each day during daytime construction activity.
The construction barriers and the construction activity have not prevented trucks from accessing Brammer’s loading dock or its Airgas storage tanks. Brammer presents no evidence to the contrary.
2.8.2. Future Impacts. Once construction of 290 Binney Street is complete, Brammer will continue to have more than adequate access to its loading dock. The subterranean slurry wall will have no impact on Brammer’s operations, including its ability to access its loading docks. Though the 290 Building will extend fI’ve feet across the 250 Binney property line, into the 290 Binney Building Easement, that will not have any effect on Brammer’s ability to access its loading docks and use the 250 Binney building.
In its final configuration, East Service Drive will have a maximum width of 33.5 feet at its entrance on Binney Street, narrow to 23.2 feet wide immediately to the North of Brammer’s loading docks, and be 20 feet wide immediately to the South of those loading docks.
The Court finds that will be more than sufficient to ensure that Brammer will continue to be able to have unfettered access to and use of its loading docks.
And Boston Properties has carefully configured the loading docks for the new 290 Binney building to ensure that they will not conflict with Brammer’s access to the 250 Binney loading docks. It will be possible for trucks to use the loading docks at the two adjacent buildings at the same time. Trucks parked at the 290 Binney loading docks will not prevent other trucks from accessing or leaving the 250 Binney loading dock area.
 
                                                            -10-
 
Furthermore, trucks will be able to enter and exit the 290 Binney loading dock and compactor bay area without traversing existing walkways or any physical structures of the 250 Binney building.
The Court also finds that traffic entering or leaving the 290 Binney parking garage will not unreasonably interfere with Brammer’s use of and access to the 250 Binney loading docks. The entrance for the 290 Binney garage will be in roughly the same location as the old entrance for the much large garage on that site that has now been demolished. There is no evidence that traffic using the old garage interfered with Brammer’s use of the 250 Binney loading docks. And the new garage under 290 Binney will have about half the number of spaces, and thus generate about half the traffic, as the old garage.
3. No Likelihood of Success. The Court will deny Brammer’s motion for a preliminary injunction because Brammer has not shown that it has any chance of proving its claim for trespass.
Brammer contends that it has “exclusive possessory rights to the 250 Premises, including both the land and the commercial building [that] houses Brammer’s facility.” And it asserts that any restriction on the usable width of East Service Drive results in “depriving Brammer of its property rights” and constitutes an unlawful trespass.
Brammer is wrong. Brammer’s sublease of the 250 Binney Street premises did not give it any right to bar reconfiguration of East Service Drive. Nor did Brammer acquire any exclusive right to use the space between the building it subleased and the property line with what is now known as 290 Binney Street.
As explained in § 2.4 above, Brammer’s rights under its Sublease have always been subordinate to the terms of Biogen’s prime Lease of 250 Binney, and subordinate to the Easement Agreement and all other instruments to which the Lease was subordinate or later on became subordinate.
Three different legal documents to which the Sublease is subordinate make clear that the temporary reconfiguration of East Service Drive during construction, and the more limited but permanent reconfiguration after the 290 Binney building is complete, do not and will not constitute a trespass.
First, § 7.2 of the Lease gives the Trust the right to construct and relocate “internal roadways, sidewalks and pedestrian paths” within the leased premises, “provided such use does not unreasonably affect” Biogen’s or Brammer’s use of the site.
 
                                                            -11-
 
This means that Brammer never had any right to insist that the Trust make no changes to the layout or useable width of East Service Drive. Putting aside for the moment Defendants’ easement rights, the Lease itself gives the Trust the right to reconfigure East Service Drive by narrowing it to create a buffer strip along the property line with 290 Binney, so long as doing so does not unreasonably affect Brammer’s ability to access its loading dock area and use the subleased premises. As noted above, § 7.2 of the Lease implicitly gives that Trust and its affiliates the right to enter the 250 Binney property to do so, and to install temporary barriers and fencing to ensure that any reconstruction of the internal roadway can be done safely.
Let’s imagine that BPLP and 290 Binney LLC had decided to construct a new building at 290 Binney that came right up to but did not extend  across the  250 Binney property line. And let’s suppose that BPLP and its affiliates decided to create a five-foot buffer between the new building and the internal roadway known as East Service Drive, with a line of bollards installed within the buffer strip to ensure that no delivery truck or other vehicle could strike the new building. The Trust would be free to relocate and narrow East Service Drive in this manner without infringing on Brammer’s leasehold interest, because the Lease (to which the Sublease is subordinate) gives the Trust broad discretion to relocate internal roadways.
Second, long before Brammer entered into the Sublease, Biogen agreed that its underlying Lease would be subordinate to the Parcel 2 Easement Agreement. As a result, the Sublease is also subordinate to this Easement Agreement.
From the time it was first adopted, the Easement Agreement created a vehicular easement in the area historically occupied by East Service Drive. This easement gave the fee owners of all of the individual parcels within Parcel 2 the right to use the easement area for vehicular access or egress.
This easement confirms what was also made clear in § 7.2 of the Lease; Brammer never had any right to exclusive use of East Service Drive.
Third, the vehicular easement in the area where East Service Drive had been located was altered earlier this year in the Restated Easement Agreement. A roughly 8-feet wide slice of this vehicular easement, running alongside the 290 Binney property line, was altered and converted into a “perpetual and exclusive right and easement to construct, reconstruct, support, maintain, repair, and replace any and all portions of the 290 Binney Building.” This
                                                            -12-
 
portion of the prior vehicular easement is now known as the “290 Binney Building Easement.”
This alteration of the purpose and permissible use of part of the pre-existing vehicular easement is valid and enforceable.
The Easement Agreement provides, in § 2, that “any of the easements and rights” created by the contract “may be … altered at any time.” Biogen agreed, in the Tenant’s Consent and Subordination that it signed in connection with and just a few days after the adoption of the Easement Agreement, that its Lease would be subordinate to any future “easements or rights … hereafter granted by the Trust pursuant to the terms and conditions of the Easement Agreement,” without any need for a further agreement or other document to be executed, delivered, or recorded. Since these two contracts are “interlocking documents” that are “interrelated in purpose,” the Court must read them together.[8]
In sum, under the Easement Agreement and Biogen’s consent, the Trust has always had the right to alter the nature of the easements to which the Lease (and therefore the Sublease) are subordinate. The provision in the Restated Easement Agreement that altered part of the vehicular easement over the 250 Binney site to create the rights embodied in the 290 Binney Building Easement is therefore valid.
Brammer’s assertions that this revised easement unlawfully “transfer[s] Brammer’s property rights to 290 Binney LLC,” because the Sublease gives Brammer a right “to the full possession of the 250 Premises,” are without merit. Brammer never had any exclusive right use East Service Drive. And it never had any right to occupy or use the 8-foot strip of land running along what is now known as the 290 Binney property line, if the Trust decided to reconfigure and relocate East Service Drive so that it no longer runs over that part of the 250 Binney site.
In any case, Brammer agreed that its rights under the Sublease would be subordinate to the existing Easement Agreement, and to any altered easement or other instrument to which the Lease “may hereafter” be subordinate. That means Brammer’s Sublease is subordinate to the 290 Binney Building Easement.
 
--------------------------------------------
 
[8]        Cf. Matthews v. Planning Bd. of Gloucester, 72 Mass. App. Ct. 456, 463 (2008), quoting Striar v. American Medical Intern., Inc., 45 Mass. App. Ct. 87, 95 (1998).
 
                                                            -13-
 
Nothing in the Sublease requires Brammer to consent to alterations of easement rights that are permitted under the original Easement Agreement. To the contrary, Brammer’s agreement that its Sublease would be subordinate to future instruments to which the Lease would be subordinate gave the parties to the Easement Agreement the power to alter easement rights in a manner that would bind Brammer, without any need for further consent by Brammer. See Van Dusen Aircraft Supplies of New England, Inc. v. Massachusetts  Port Auth.,  361 Mass. 131, 141 (1972) (provision stating that lease with fixed base operator shall be subordinate to any future agreement between Massport and Federal government allowed Massport “unilaterally to effect whatever amendments to the agreements might be required by FAA”).[9]
Having bound itself to comply with future or altered easements to which the Lease would be subordinate, Brammer cannot now contend that it has an absolute and inviolable right to exclusive possession of the thin strip of land that runs along the 290 Binney property line.
The Court has found, as discussed above, that the current and planned permanent rerouting of East Service Drive does not and will not unreasonably affect or limit Brammer’s ability to access its loading dock area or otherwise to use the subleased premises. The challenged activities therefore do not and will not take away any property right that Brammer acquired in its Sublease of the 250 Binney site.
It follows that Brammer cannot succeed in proving that there has been or will be any unlawful trespass. Use of an easement, in a manner consistent with the easement holder’s rights, does not constitute trespass on land owned or leased by someone else. See, e.g., Anderson v. Healy, 36 Mass. App. Ct. 131, 134–135 (1994). And the ongoing construction activity within the 290 Binney Building Easement, as well as the permanent encroachment of the completed 290 Binney
 
--------------------------------------------
 
[9] The unpublished and thus non-binding decision in Trustees of Thomas Graves Landing Condominium Trust v. Gargano, No. 15-P-675, 2016 WL 3460519 (Mass. App. Ct. June 23, 2016), rev. denied, 475 Mass. 1105 (2016), is not to the contrary, and Brammer’s reliance upon it is misplaced. Thomas Graves Landing did not involve any kind of subordination agreement. Instead, it held that an exclusive parking easement in a common area of a condominium building was invalid because it was issued “without the consent of all unit owners whose percentage of the undivided interest [in the common areas] is affected,” as required by G.L. c. 183A, § 5(b).
 
                                                            -14-
 
building and adjacent, subterranean slurry wall, are expressly allowed under the 290 Binney Building Easement.
ORDER
Plaintiff’s motion for preliminary injunction is denied.